Commonwealth of Pennsylvania,  :
Department of Corrections - SCI  :
Chester,  :
                    Petitioner  :
                                 :
            v.                   :   No. 150 C.D. 2021
                                 :   Submitted: July 2, 2021
Crystal Faison (Workers'         :
Compensation Appeal Board),      :
                    Respondent   :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE J. ANDREW CROMPTON, Judge

OPINION BY
JUDGE COHN JUBELIRER                    FILED: November 10, 2021


Commonwealth of Pennsylvania, Department of Corrections - SCI Chester (Employer) petitions for review of the Workers' Compensation Appeal Board's (Board) January 26, 2021 Order that affirmed the Workers' Compensation Judge's (WCJ) September 24, 2019 Decision granting Crystal Faison's (Claimant) Claim Petition. The WCJ found that Claimant had proven that she suffered a work-related psychological injury as a result of being sexually assaulted while in the course of employment and that Claimant was entitled to ongoing temporary total disability benefits as of August 10, 2018. On appeal, Employer argues that:[1] (1) the WCJ erred in denying its Motion to Dismiss the Claim Petition and granting the Claim Petition because the WCJ lacked the authority to determine that Claimant was raped/sexually assaulted and, therefore, violated the alleged perpetrator's due

---

[1] We have reorganized the issues raised for ease of discussion.

process rights in doing so; (2) the WCJ and the Board erred in not requiring corroborating evidence to prove that Claimant suffered an abnormal working condition; (3) the WCJ's findings were arbitrary and capricious and not based on substantial evidence; and (4) the WCJ committed reversible error by finding testimony that was not submitted in this matter to be reliable and relying on this testimony in its decision. After careful review, we affirm the Board's Order.

## I. BACKGROUND

### A. *The Claim Petition*

Claimant worked for Employer as a corrections officer. (WCJ's Decision, Finding of Fact (FOF) ¶ 4(a).)[2] Claimant filed the Claim Petition alleging that, "as a result of being sexually assaulted by a co-worker [(Coworker),]" Claimant developed a psychological injury. (Claim Petition at 2; FOF ¶ 1.) The Claim Petition sought partial disability benefits starting May 20, 2018, the date of the work-related incident, and total disability benefits starting August 10, 2018, the date Claimant began taking sick leave due to the work-related injury. (Claim Petition at 2; FOF ¶¶ 1, 4(k).) Employer denied Claimant's allegations. (FOF ¶ 2.) Employer filed two Motions to Dismiss, challenging the WCJ's jurisdiction or authority over this matter, which the WCJ denied. (Reproduced Record (R.R.) at 17a.)

### B. *Claimant's Evidence*

In support of the Claim Petition, Claimant testified before the WCJ and submitted Claimant's prior deposition and the deposition of Justin Wiley, Psy.D., a licensed clinical psychologist. (FOF ¶¶ 4-6.)

---

[2] The WCJ's Decision is found at pages 20a through 35a of the Reproduced Record.

1.     Claimant's Testimony

In Claimant's deposition, Claimant testified as follows.[3]   Claimant began working at State Correctional Institution – Chester as a corrections officer in April 2007.  (*Id.* ¶ 4(a), (b).)  Prior to the May 20, 2018 incident, Claimant worked in Corridor B of the institution, which is the main corridor connecting the housing units in tower A to the Restricted Housing Unit (RHU).  (*Id.*)  During the incident on May 20, 2018, Claimant was in the RHU's control bubble, which "is an area where there are monitors and controls to open the doors and sliders in the actual unit."  (*Id.* ¶ 4(c).)  Claimant had entered the RHU's control bubble to leave food in the refrigerator.  (*Id.*)  When Claimant went to do so, Coworker approached Claimant from behind, kissed Claimant's ear, and began trying to undo the belt to Claimant's uniform pants.  (*Id.*)  "During this time[,] Claimant was trying to push [Coworker] off, but [Coworker] was persistent."  (*Id.*)  Coworker then engaged in penetrative sexual intercourse with Claimant, while Claimant told Coworker no, that she "did not want to[,] and [for Coworker] to stop."  (*Id.*)  The incident lasted between five and seven minutes, and Claimant continued working afterwards and finished that shift.  (*Id.* ¶ 4(d).)

Claimant had known Coworker for about two years prior to the May 20, 2018 incident, and they had a prior sexual relationship in June 2017.  (*Id.* ¶ 4(g).)  As of 2018, "Claimant considered their relationship a friendship more than a romance." (*Id.*)  On May 12, 2018, eight days before the incident, Claimant texted Coworker, and the conversation "was friendly in nature." (*Id.*; *see* R.R. at 213a-14a.)  Coworker then texted Claimant on May 16, 2018, implying that Coworker wanted to have sex with Claimant.  (FOF ¶ 4(g).)  "Claimant had previously discussed with [Coworker]

<hr>

[3] Claimant's September 17, 2018 deposition testimony is found at pages 113a through 211a of the Reproduced Record and is summarized in the WCJ's Decision at Finding of Fact 4.

3

that she did not want to have sex[,]" and Claimant again told Coworker the same over text. (*Id.*; R.R. at 215a-17a.)

Claimant texted Coworker the day after the incident concerning what occurred. (FOF ¶ 4(h); R.R. at 221a-22a.) Specifically, Claimant stated, "You finally got what you were requesting lol [(laugh out loud).]" (R.R. at 222a.) After Coworker did not respond, Claimant again texted Coworker on May 23, 2018,[4] writing that Claimant's appetite has been affected and that she could not ignore what happened. (FOF ¶ 4(h).) Following the May 20, 2018 incident "Claimant was scared and did not know what to expect or how to take the situation." (*Id.* ¶ 4(e).) Claimant "felt hurt and started to have crying spells and melt[]downs at the office." (*Id.*)

After another coworker (Officer) asked what was wrong because Claimant appeared upset, Claimant decided to discuss the incident with Officer. (*Id.* ¶ 4(i).) After Claimant explained what occurred, Officer informed Claimant that Coworker "was married to someone with whom they work[,]" of which Claimant was unaware. (*Id.*) Officer also opined that Claimant had been raped. (*Id.*) Upon learning the truth about Coworker's marriage, Claimant decided to text Coworker again, stating, "now that I know the truth, I should have put up more resistance. But you would not take no for an answer." (R.R. at 225a.) Claimant felt "used and violated." (FOF ¶ 4(h); R.R. at 225a.)

Claimant reported the incident to Employer on June 6, 2018. (FOF ¶ 4(f).) After Claimant spoke with two superiors, the two accompanied Claimant to the Pennsylvania State Police (State Police) Barracks. (*Id.*) "When Claimant initially went to the State Police, she did not want to pursue criminal charges because she

---

[4] The WCJ stated the date as May 22, 2018, in the Findings of Fact, but the Reproduced Record shows that Claimant sent these texts on May 23, 2018. (*See* R.R. at 222a-24a.)

4

was afraid of retaliation." (*Id.*) On June 11, 2018, Claimant was also interviewed by the Director of the Equal Employment Opportunity (EEO) Office for Employer (EEO Director), as a part of an EEO investigation regarding the incident. (*Id.* ¶ 4(o).)

Claimant began seeing Dr. Wiley on July 17, 2018. (*Id.* ¶ 4(j).) Before the incident, Claimant "had never seen a mental health professional or taken anti-depressants or anti-anxiety medicine." (*Id.* ¶ 4(b).) At the time of Claimant's deposition, Claimant was treating with Dr. Wiley once per week and was also planning to see a psychiatrist at Dr. Wiley's recommendation. (*Id.* ¶ 4(j); R.R. at 209a-10a.) Though Claimant had continued working after the incident, Claimant had been "zoning out, was crying easily[,] and was irritable." (FOF ¶ 4(j).) Further, Claimant "crie[d] more than normal[,]" "ha[d] a hard time getting to sleep[,]" "ha[d] flash[]backs and nightmares[,]" "ha[d] [] began to suffer from anxiety attacks[,]" and began becoming overwhelmed very easily. (*Id.* ¶ 4(k), (s).) Claimant also "began to isolate[,] lost weight[,]" and began smoking more cigarettes. (*Id.* ¶ 4(k).) While Claimant had been working a regular schedule as best as possible after the incident, Claimant decided to take sick leave starting August 10, 2018. (*Id.*)

On August 18, 2018, police went to Claimant's home after her "sister had called the police concerned that Claimant was suicidal." (*Id.* ¶ 4(j).) Claimant had sent a text to her mother indicating an intent for self-harm, had been drinking alcohol "in an attempt to numb her feelings and go to sleep[,]" and "had also taken some over[-]the[-]counter sleeping pills." (*Id.*) Police brought Claimant to the emergency room and then transported Claimant to a crisis center, where she stayed from August 19, 2018, through August 20, 2018. (*Id.*)

On cross-examination, Claimant admitted to the prior sexual relationship with Coworker and Claimant's lack of knowledge regarding Coworker's marriage. (*Id.* ¶ 4(m).) As to the incident itself, Claimant admitted that Coworker was not "violent" but explained that Coworker "bent [Claimant] over the chair" and "put [Coworker's] weight on Claimant" such that "Claimant was unable to move forward or side to side." (*Id.* ¶ 4(n)-(o).) Claimant discussed a statement written by a State Police Trooper (Trooper) following an interview on June 6, 2018, the day that Claimant reported the incident. (*Id.* ¶ 4(p).) In that statement, "Claimant responded [']no['] to being assaulted or raped by [Coworker]. Claimant was penetrated but [] did not want to use the term 'rape or assault.'" (*Id.*) However, Claimant made clear that she did not give Coworker permission to engage in sexual intercourse. (*Id.* ¶ 4(t).)

At the hearing before the WCJ,[5] Claimant stated that she attempted to press charges and returned to the State Police to speak with Trooper, but Trooper refused to take her statement or reopen the investigation. (*Id.* ¶ 5(c).) As to Claimant's injury and conditions, Claimant explained that she: continues to treat with Dr. Wiley and is taking a generic anti-depressant; is "anxious and overwhelmed by having to rehash the details of the assault"; "still has visions of the incident and night sweats"; and continues to suffer from "anxiety and depression" but is "trying to handle it as best as she can." (*Id.* ¶ 5(a)-(b).) Though "trying to utilize her children and family as support[,] there [we]re moments when [Claimant] just fe[lt] hopeless." (*Id.* ¶ 5(b).)

---

[5] Claimant's testimony before the WCJ at the February 4, 2019 hearing is found at pages 83a through 96a of the Reproduced Record and is summarized in the WCJ's Decision at Finding of Fact 5.

6

## 2. Dr. Wiley's Testimony

Dr. Wiley testified by deposition as follows.[6] Dr. Wiley first examined Claimant on July 17, 2018. (*Id.* ¶ 6(a).) Dr. Wiley took a history from Claimant regarding the May 20, 2018 incident and the resulting symptoms that Claimant was experiencing. (*Id.*) Dr. Wiley explained that "Claimant was in a lot of distress and re-experiencing symptoms associated with trauma. There were symptoms common to post-traumatic stress disorder." (*Id.*) Claimant "also had symptoms associated with hyper-arousal[,] such as panic and anxiety." (*Id.*) Claimant "had insomnia, [feelings of] hopelessness, depressed mood[,] and appetite disturbance[,]" as well as "sadness, pessimism[,] and anhedonia[,] which is a lack of pleasure in previously pleasurable things." (*Id.*) Additionally, "Claimant was self-critical, cried a lot[,] and had the feeling [of] being punished." (*Id.*) Dr. Wiley conducted "a mental status examination" and "a Beck depression inventory," and "Claimant scored on the severe range on the depression inventory." (*Id.*) Dr. Wiley also performed the "Beck Hopelessness Scale, which revealed Claimant to have a lot of despair and hopelessness around the future." (*Id.*) Finally, Dr. Wiley "administered the Brief Symptom Inventory[,] which incorporates all the other scales and tests" and "is helpful in the consistency in making a diagnosis." (*Id.*) Given the evaluation, tests, and Claimant's history, Dr. Wiley "diagnosed Claimant with post-traumatic stress disorder and major depression[.]" (*Id.*) Dr. Wiley opined that "[t]he single episode causing the major depression disorder was" the May 20, 2018 incident. (*Id.*)

Dr. Wiley also reviewed the investigative reports from the State Police. (*Id.* ¶ 6(c).) Dr. Wiley explained that Claimant "was under considerable stress and discussed significant fear of retaliation from" Coworker and "that it was common

---

[6] Dr. Wiley's November 13, 2018 deposition testimony is found at pages 240a through 310a of the Reproduced Record and is summarized in the WCJ's Decision at Finding of Fact 6.

7

among rape victims to show reluctance or waffling. It does not mean that the rape did not occur." (*Id.*) Dr. Wiley also reviewed the report from Brian Bora, M.D., Employer's expert, who conducted a psychiatric examination of Claimant. (*Id.* ¶¶ 6(c), 7(a).) Dr. Wiley agreed that Claimant did not display "any indications that Claimant was malingering or feigning symptoms." (*Id.* ¶ 6(c).)

On cross-examination, Dr. Wiley admitted that "Claimant had not seen any other physician or counselor for the" May 20, 2018 incident. (*Id.* ¶ 6(e).) Dr. Wiley also admitted that it was not until after the September 4, 2018 examination of Claimant that Dr. Wiley first stated that Claimant was unable to work. (*Id.*) Finally, Dr. Wiley testified "that Claimant ha[d] been indecisive about whether or not [Claimant] wanted to press charges." (*Id.*)

### C. Employer's Evidence

Employer submitted the deposition testimonies of Dr. Bora, Trooper, and EEO Director.[7]

#### 1. Dr. Bora's Testimony

Dr. Bora testified[8] that he "conducted a psychiatric examination of Claimant on October 9, 2018[,]" which involved taking a history from Claimant about the May 20, 2018 incident and reviewing various records. (*Id.* ¶ 7(a).) Dr. Bora testified that, while Claimant told Dr. Bora that she did not have any psychiatric history, "there

---

[7] Employer also submitted the depositions of a lieutenant (Lieutenant) and major (Major) for Employer, who are both in Claimant's chain of command. The testimonies are not relevant to the present determination. The WCJ found that Lieutenant's testimony was "not credible or persuasive to defeat Claimant's allegation of rape by [Coworker]" and that, while Major was "generally credible," Major's testimony was "not determinative to any issue with regard to Claimant's Workers' Compensation claim[]" and was, therefore, rejected. (FOF ¶¶ 19-20.) Employer has not challenged the WCJ's determinations with respect to these witnesses.

[8] Dr. Bora's January 22, 2019 deposition testimony is found at pages 628a through 684a of the Reproduced Record and is summarized in the WCJ's Decision at Finding of Fact 7.

8

were family medicine notes from December 2016[] where [Claimant] did report to her family physician that she had depressive symptoms." (R.R. at 648a.) Based on the records and the examination, "Dr. Bora opined that it was not clear . . . that Claimant had been raped." (FOF ¶ 7(b).) Relying on Claimant's usage of "lol" in the text messages to Coworker and their prior sexual relationship, Dr. Bora "opined that the situation was complicated . . . and there appeared to be an ongoing flirtation." (*Id.*) Dr. Bora asserted that "Claimant's perception changed . . . when [Claimant] found out that [Coworker] was married." (*Id.*) Dr. Bora also concluded from a December 7, 2016 report in which Claimant described feeling depressed to Claimant's family doctor "to mean that Claimant did have a history of depression[.]" (*Id.*) Accordingly, "Dr. Bora opined that Claimant did not sustain any work[-]related injury." (*Id.* ¶ 7(c).) While Dr. Bora recognized that "Claimant reported depressive symptoms after the" May 20, 2018 incident, "Dr. Bora opined that it is most likely due to" Claimant being unemployed, Claimant's failed marriage, Claimant's co-workers being cold to Claimant, and the difficulty of the surrounding situation. (*Id.*) Dr. Bora maintained that "[a]ny type of issues that Claimant currently has are not related to any incident at work." (*Id.*)

Dr. Bora also made the following admissions: Dr. Bora "ha[d] not interviewed sexual assault victims outside of his private practice[,] but some of his patients have been sexually assaulted"; Dr. Bora "does not draw conclusions within the context of a treatment plan as to whether or not the sexual assault took place" when treating patients in his private practice; and Dr. Bora "did not find Claimant to lack any credibility" or "find any evidence of symptom magnification o[r] symptom fabrication[.]" (*Id.* ¶ 7(d).) Dr. Bora also agreed that Claimant met all six criteria for a diagnosis of post-traumatic stress disorder but stated that, given "the text

9

messages and the witness statement" to the State Police, "it was not clear that a rape did occur." (*Id.*) Dr. Bora concluded that Claimant did not meet the criteria for post-traumatic stress disorder "because she continued to work" after the May 20, 2018 incident. (*Id.*)

### 2. Trooper's Testimony

Trooper testified as follows.[9] When Claimant went to the State Police with two superiors in June 2018, Trooper interviewed Claimant regarding the May 20, 2018 incident. Claimant explained to Trooper "that she did not want anything done but needed to tell her side of the story." (*Id.* ¶ 8(b).) Trooper's interview with Claimant was video recorded. (*Id.*) "Claimant was upset and crying but was willing to talk to" Trooper, who listened to Claimant's recollection of the incident and took notes. (*Id.*) "When asked if Claimant would be able to write down [a] statement," Claimant said she would not. (*Id.*) Instead, Trooper "composed questions for Claimant which required one[-]word answers." (*Id.*) Trooper then wrote out possible answers to those questions, "gave Claimant an opportunity to disagree with the statements[,]" and had Claimant initial the answer with which Claimant agreed. (*Id.*) "In response to a question during this deposition as to whether or not Claimant said she was raped or sexually assaulted by [Coworker], Trooper responded that Claimant denied this." (*Id.* ¶ 8(c).) Trooper also asked whether Claimant was more upset about finding out that Coworker was married, and Claimant answered in the affirmative. (*Id.*)

Trooper testified that there was an attempt to interview Coworker, but Coworker refused. (*Id.* ¶ 8(d).) Based on Claimant's interview, Trooper opined that

---

[9] Trooper's January 17, 2019 deposition testimony is found at pages 546a through 609a of the Reproduced Record and is summarized in the WCJ's Decision at Finding of Fact 8.

10

"it appeared that [Claimant] was not sexually assaulted or raped." (*Id.*) Trooper believed that Claimant's statement that she did not want to get Coworker in trouble and Claimant's responses to Trooper's written questions and answers agreeing that Claimant had not been raped or sexually assaulted supported this position. (*Id.*) Accordingly, Trooper decided to terminate the investigation. (*Id.*)

On cross-examination, Trooper admitted that Claimant stated that she "pushed [Coworker] away but not as much as she should have." (*Id.* ¶ 8(f).) Further, Trooper stated he "d[id] not know what a leading question is[]" and admitted to not having received any "training from a psychologist or mental health professional[]" with regard to ascertaining "the state of mind of a sexual assault victim." (*Id.*) Trooper "did not find Claimant credible[] but rather thought she was upset about having a sexual affair" with a married individual. (*Id.*) With regard to the specific questions asked of Claimant, Trooper "agreed that the video showed that Claimant, when asked if she was sexually assaulted, responded by saying that she did not know whether it was safe to say that." (*Id.* ¶ 8(g).)

### 3.    EEO Director's Testimony

EEO Director testified as follows.[10] EEO Director "is tasked with overseeing discrimination complaints[,] training for diversity and sexual harassment[,]" and "sexual harassment investigations." (*Id.* ¶ 11(a).) EEO Director investigated Claimant's rape allegation, which "consisted of witness interviews, surveillance video review of Claimant's police interview, [and] review of text messages and police reports." (*Id.* ¶ 11(b).) In forming conclusions in the investigation, EEO Director mostly relied on Claimant's agreement with Trooper's written answer that

---

[10] EEO Director's January 10, 2019 deposition testimony is found at pages 456a through 518a of the Reproduced Record and is summarized in the WCJ's Decision at Finding of Fact 11.

Claimant had not been sexually assaulted and Claimant's text message to Coworker in which Claimant used the term "lol." (*Id.*) EEO Director "felt this was strong evidence because Claimant" first alleged having been raped "but then immediately took it back" during the interview with Trooper. (*Id.*) EEO Director also took a statement from Officer, which "confirm[ed] that the first time Claimant learned that [Coworker] was married was during the course of [the] conversation with [Officer] where [Claimant] confided in [Officer] that [Claimant] did not have consensual intercourse with [Coworker]." (*Id.* ¶ 11(e).) During EEO Director's interview with Claimant, Claimant "confirmed that Claimant was at first in denial that this was a sexual assault." (*Id.* ¶ 11(f).) As to why Claimant denied that it was so to Trooper, Claimant stated that she "feared retaliation and was terrified." (*Id.*) During the interview with Claimant, EEO Director explained that Claimant stated that she "told [Coworker] numerous times that she did not want to have sex with [Coworker]." (*Id.* ¶ 11(d).) EEO Director "could not reach any conclusions as to whether any consensual sex occurred." (*Id.* ¶ 11(f).)

### D. The WCJ's Decision

The WCJ reviewed the evidence and testimony submitted by the parties and made factual findings and credibility determinations. First, the WCJ reviewed the text messages between Claimant and Coworker. (*Id.* ¶ 12; *see* R.R. at 213a-25a.) Based on the review, the WCJ found that "[i]t is not possible to accurately ascribe sentiment or emotion to texts" and "that the texts document that Claimant refused [Coworker's] advancements and overtures to have sex prior" to the May 20, 2018 incident. (*Id.* ¶ 12.) Further, the WCJ found that these text messages showed that, after the incident, "Claimant confronted [Coworker]" and explained that Claimant was affected by the incident and that Claimant "could not ignore what had

12

happened." (*Id.*) The WCJ found that "[t]hese texts [confronting Coworker] were sent before Claimant was told that [Coworker] was married." (*Id.*)

The WCJ also reviewed the videotape of Trooper's interview of Claimant. (*Id.* ¶ 13.) The WCJ found that "a review of the videotape in its entirety leaves no question that Claimant was the victim of a rape at work on May 20, 2018." (*Id.*) The WCJ described that, during the interview with Trooper, Claimant is "clearly[,] visibly upset and cries uncontrollably at times when Trooper leaves the room." (*Id.*) "Although Trooper [] encourages Claimant that this incident was more of a consensual intercourse," the WCJ found that "the record is devoid of consent." (*Id.*) The WCJ found "it significant that Claimant was too upset to write a statement." (*Id.*) Further, the WCJ found Trooper's written question and answer approach did not amount to "a statement [by Claimant] but a series of questions which predetermine the answer in a yes or no fashion." (*Id.*) The WCJ characterized Trooper's approach as using "only leading questions which when answered deny a rape." (*Id.*) The WCJ found Trooper's tactics "make it seem[] that Claimant only got upset when she learned that [Coworker] was married[,]" but "[t]he videotape documents Claimant's lack of comfort with being compelled to answer yes or no and her hesitation in giving the answers." (*Id.*) Accordingly, the WCJ concluded that "[t]he videotape supports Claimant's testimony that she was raped at work on May 20, 201[8]." (*Id.*)

Turning to credibility determinations, the WCJ determined Claimant's testimony was credible and persuasive. (*Id.* ¶ 14.) The WCJ explained "Claimant's composure and demeanor during [] live testimony and [the WCJ's] observation of the videotape interview" with Trooper to be significant in making this credibility determination. (*Id.*) The WCJ found that Claimant's testimony was consistent in

13

that Claimant "never gave her consent to be penetrated by" Coworker, told Coworker no, and rebuffed Coworker's advancements before the incident. (*Id.*) Further, the WCJ noted that Claimant "never had any difficulty performing her job duties" and "never sought any mental health treatment or experienced any mental health illness prior to" the incident. (*Id.*) Accordingly, the WCJ accepted Claimant's testimony as fact. (*Id.*)

Regarding Dr. Wiley's and Dr. Bora's testimony, the WCJ found "that the testimony of Dr. Wiley was more credible and persuasive than the testimony of Dr. Bora." (*Id.* ¶ 15.) The WCJ explained that "Dr. Wiley's testimony is more credible because it is consistent with Claimant's credible testimony[,] which has been accepted as fact. As Claimant's treating psychologist, [Dr. Wiley] was more familiar with the rape, Claimant's report of the rape, her treatment and her devolution into a crisis in August of 2018." (*Id.*) Accordingly, the WCJ accepted Dr. Wiley's testimony in its entirety as fact. (*Id.*)

Conversely, the WCJ deemed Dr. Bora's testimony to be "not credible or persuasive because [Dr. Bora] believed Claimant to have mental health issues in the past because of one note in her family doctor's records from December 7, 2016," despite the fact that "[t]here is no other indication that Claimant sought mental health treatment or had a mental health illness." (*Id.* ¶ 16.) Further, the WCJ noted that Dr. Bora believed that Claimant was not raped "because[,] in [Dr. Bora's] opinion, Claimant flirted with" Coworker and also because Claimant "had a prior sexual relationship with" Coworker. (*Id.*) With respect to Claimant's perception changing after discovering that Coworker was married, the WCJ found that Dr. Bora "completely misstates the timeline of Claimant's distress over her rape which was immediate." (*Id.*) The WCJ explained Dr. Bora's misunderstanding of the timeline,

14

as "Claimant only found out [Coworker] was married **after** Officer asked why Claimant was sad" and Claimant told Officer about the incident. (*Id.* (emphasis added).) Finally, the WCJ found that Dr. Bora "lacks credibility because he admits that if Claimant were a private patient, he would not question whether or not she had been sexually assaulted but would focus on treatment[,] assuming the history to be true." (*Id.*) Finding Dr. Bora's opinions to be "biased and without competent factual foundation," the WCJ rejected Dr. Bora's testimony in its entirety. (*Id.*)

As for Trooper's testimony, the WCJ found that "Trooper [] testified accurately as to how he conducted the interview with Claimant[]" but did "not find [Trooper's] conclusions that the assault on Claimant was consensual sexual intercourse credible or persuasive." (*Id.* ¶ 18.) Finding that Claimant never consented but specifically said "no," the WCJ added that the facts that Claimant "admits she froze" and that she "should have fought [Coworker] off more . . . do not make the forced intercourse consensual." (*Id.*) As for Trooper's interview with Claimant, the WCJ found the questions to be leading in nature because "all of the questions he wrote for Claimant that p[ur]port to be 'her' statement[] presuppose an answer compelling a conclusion that the sex was consensual, and [that] Claimant was upset" because she discovered that Coworker was married. (*Id.*) The WCJ explained that Trooper's "reasoning does not support that the rape did not occur[]" and that Trooper's reliance on a lack of "violence" is in error where there was no consent. (*Id.*)

Turning to EEO Director's testimony, the WCJ found the testimony not credible or persuasive. The WCJ noted that EEO Director "relied heavily on the interview of Claimant by Trooper [] and the text messages." (*Id.* ¶ 21.) Given that the WCJ "has found both not credible to defeat Claimant's" competent and

15

persuasive testimony concerning the incident, the WCJ determined that EEO Director's "investigation and testimony [were] not based on a competent factual foundation and [] rejected" them. (*Id.*)

Finally, despite that Officer did not provide testimony in this matter, the WCJ stated that she found Officer's testimony consistent with Claimant's testimony and accepted it as fact. (*Id.* ¶ 17.) Further, in discussing Claimant's credibility, the WCJ found that "Claimant's testimony is also supported by the testimony of Officer[]." (*Id.* ¶ 14.)

Accordingly, the WCJ found that "[o]n May 20, 2018, Claimant was raped in the control bubble of the [RHU] by [Coworker.]" (*Id.* ¶ 22.) The WCJ explained that the burden of proof in this "mental/mental case" requires "proof of an abnormal working condition" and found that "[f]orced sexual intercourse without consent is a rape[]" and that "[r]ape is never a normal working condition." (*Id.* ¶ 23.) The WCJ found that the incident caused Claimant to sustain a psychological injury in the form of post-traumatic stress disorder and major depression, and that this injury was "not a subjective reaction to a normal working condition[]" but has been "objectively verified by Dr. Wiley." (*Id.* ¶¶ 23-24; WCJ's Conclusions of Law (COL) ¶ 2.) As a result, the WCJ concluded, "Claimant became totally disabled effective August 10, 2018." (FOF ¶ 25; COL ¶ 3.) Employer appealed the WCJ's Decision to the Board.

### E. The Board's Opinion[11]

On appeal to the Board, Employer argued that: (1) "the WCJ lacked jurisdiction to decide whether Claimant was raped and[,] in doing so[,] violated the criminal due process rights of [Coworker]"; (2) the WCJ's Decision was not supported by substantial, competent evidence; (3) the WCJ capriciously disregarded

---

[11] The Board's Opinion is found at pages 47a through 60a of the Reproduced Record.

16

evidence; and (4) the WCJ "erroneously found Claimant's testimony was corroborated by Officer[.]" (Board Opinion (Op.) at 2.)

First, the Board concluded that Claimant satisfied the "burden of proving by objective evidence that [Claimant] sustained a psych[ological] injury and that such injury was other than a subjective reaction to normal working conditions." (*Id.* at 11.) The Board explained that Claimant provided proof that she suffered from post-traumatic stress disorder and major depressive disorder through her "credited testimony as to an actual event and the credited testimony of her treating psychologist[,] Dr. Wiley." (*Id.*) Because "Claimant's testimony was not limited to [a] belief of subjective, abnormal conditions[] but rather included [Claimant's own] description . . . of an actual, specific event[,]" the question of credibility was solely for the WCJ to make within her discretion. (*Id.*) Given that the WCJ found that "Claimant was physically assaulted causing her to sustain a psychological injury[,]" the Board determined that the credited testimonies of Claimant and Dr. Wiley "constitute[d] substantial, competent evidence [that] Claimant sustained work-related" injuries rendering Claimant "totally disabled ongoing from August 10, 2018." (*Id.*) The Board added that the fact that "Claimant provided a signed statement to the . . . State Police denying rape or sexual assault does not diminish the substantial, competent evidence supporting the WCJ's Decision." (*Id.*) Because Claimant's testimony regarding the event was found credible, and given that the medical evidence from Dr. Wiley "unequivocally established that the abnormal working conditions caused psych[ological] injuries," the Board concluded that "the WCJ did not err in finding a compensable injury." (*Id.* at 12.)

Turning to Employer's contention that "the WCJ's finding that Claimant was physically assaulted or made reference to the word 'rape' is [] tantamount to a

17

criminal conviction[,]" the Board explained that while "a determination as to whether the crimes of sexual assault or rape occurred were outside [the WCJ's] specific jurisdiction, the WCJ was well within her purview to determine whether Claimant was subjected to abnormal working conditions[.]" (*Id.* (emphasis added).) The Board stated that the Workers' Compensation Act[12] (Act) "is applicable to all injuries occurring within Pennsylvania[.]" (*Id.*) Accordingly, the Board explained, "[a] WCJ may analyze evidence concerning incidents on the job leading to disability, even if that evidence implicates criminal conduct[,]" comparing the WCJ's finding here to those in *Pennsylvania Liquor Control Board v. Workers' Compensation Appeal Board (Kochanowicz)*, 108 A.3d 922 (Pa. Cmwlth. 2014); *Miller v. Workers' Compensation Appeal Board (New Wilmington Family Practice)*, 724 A.2d 971 (Pa. Cmwlth. 1999); and *Archer v. Workmen's Compensation Appeal Board (General Motors and Royal Insurance Co.)*, 587 A.2d 901 (Pa. Cmwlth. 1991). (Board's Op. at 12.) "That the same set of facts can lead to litigation in other legal or administrative arenas with their own burdens of proof and procedural rules[,]" the Board held, "is not a usurpation of those arenas." (*Id.* at 12-13.) The Board further emphasized that its "affirmance of the WCJ's findings of an abnormal working condition based on substantial, competent evidence does not relate to or overlap with the determination of whether a criminal act did or did not occur." (*Id.* at 13 n.3.)

The Board then addressed Employer's position that August 10, 2018, was not the proper date of disability because Dr. Wiley did not document that Claimant should not be working until September 4, 2018. The Board explained that "the record indicates that August 10, 2018[,] was the date Claimant ceased working due to her ongoing symptoms of depression and anxiety." (*Id.*) "Because the WCJ

---

[12] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

18

credited Claimant's testimony in that regard, [the Board] decline[d] to disturb that date on appeal[]" as those "credibility determinations were not made arbitrarily and capriciously and [the WCJ's] findings are supported by substantial evidence[.]" (*Id.* (citations omitted).)

Finally, the Board turned to Employer's argument that "the WCJ erred by finding Claimant's testimony was corroborated by Officer as that testimony is absent from the record." (*Id.*) Agreeing that Officer's testimony was not in the record, the Board nonetheless concluded that the WCJ's error in so stating was "harmless as this absent testimony was explicitly found to be consistent with Claimant's testimony, which is part of the record and was found credible." (*Id.* at 13-14 (citing *Benson v. Workmen's Comp. Appeal Bd. (Haverford State Hosp.)*, 668 A.2d 244, 248-49 (Pa. Cmwlth. 1995)).) Accordingly, the Board affirmed the WCJ's Decision.[13] Employer now petitions for review.[14]

## II.  DISCUSSION
### A.  *Whether the WCJ had authority to find that the May 20, 2018 incident occurred as Claimant testified.*

#### 1.  Parties' Arguments

Employer argues that the WCJ erred in denying its Motion to Dismiss the Claim Petition and granting the Claim Petition because the WCJ lacked the authority to determine that the May 20, 2018 work incident occurred and that, in doing so, acted outside of the WCJ's jurisdiction. Employer posits that the General Assembly "vested the power to prosecute criminal matters in the Attorney General" and district

---

[13] Two of the Board's Commissioners concurred in the result only.

[14] Our scope of review in workers' compensation matters "is limited to determining whether constitutional rights have been violated, whether an error of law has been committed[,] and whether all necessary findings of fact are supported by substantial evidence." *Archer*, 587 A.2d at 903.

attorneys and that the statute vesting such authority "is unambiguous and should be read as a restriction on any other party acting to investigate criminal offenses" under the plain meaning of the statute's language. (Employer's Brief (Br.) at 31 (citing Section 206 of the Commonwealth Attorneys Act, 71 P.S. § 732-206).[15]) Because the Act does not give a WCJ any authority to investigate or determine whether a crime was committed and only confers prosecution powers to district attorneys for purposes of insurance fraud, Employer asserts, the WCJ was without authority to determine that Coworker raped Claimant. (*Id.* at 32.) Employer posits that the Board "admit[ted] that the WCJ made a determination that a criminal act did occur – something that [it] also admit[ted] is outside [the WCJ's or Board's] jurisdiction." (*Id.* at 33.)

Additionally, Employer argues that the WCJ violated Coworker's due process rights by determining that Coworker had raped Claimant. Given that Coworker "did not have the ability to confront his accuser[,]" and "did not have the opportunity to be heard, since any statements [Coworker] ma[de] could be used against [Coworker] in the future[,]" Employer contends that "Coworker was tried and administratively determined to be a rapist *in absentia*." (*Id.* at 35.) Further, recognizing that Coworker "does not face criminal prosecution or confinement as a result of the WCJ's Decision," Employer posits that Coworker does face "very real private and public scorn and humiliation by the WCJ's finding that [Coworker] raped Claimant." (*Id.* at 35-36.) Employer argues that "[t]his violation of [Coworker's] due process rights is akin to vigilante justice wherein [Coworker] has been branded a rapist by someone not authorized or capable to do so, and this branding shall remain in [Coworker's] file for the remainder of [Coworker's] career." (*Id.* at 36.)

---

[15] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§ 732-101 – 732-506.

20

Claimant responds, arguing that the WCJ acted within her jurisdiction. Claimant asserts that a WCJ is "empowered to find that an incident or circumstances on the job, if it rises to the level of abnormal working conditions, can cause psychological injuries." (Claimant's Br. at 12 (citing *Martin v. Ketchum*, 568 A.2d 159 (Pa. 1990)).) Claimant asserts that "work-related injuries are [often] caused by conduct that entails potential criminal actions" and compares this case to that in *Pennsylvania Department of Corrections v. Workers' Compensation Appeal Board (Cantarella)*, 835 A.2d 860 (Pa. Cmwlth. 2003), where the claimant, an instructor at a state prison, was touched inappropriately by an inmate and later developed anxiety and post-traumatic stress disorder. (*Id.* at 12-13.) Claimant argues "that the finding of fact . . . does not amount to a conviction; rather, the finding of fact was simply a recognition that the incident was work-related, abnormal, and caused disabling psychological conditions," which Claimant maintains is within the WCJ's authority. (*Id.* at 13.)

Claimant argues that "[t]he same set of facts can lead to litigation in" the "spheres" of criminal, civil, and administrative law, "each with their own separate burdens of proof and procedural rules." (*Id.* at 14.) Claimant further contends that Employer's "attempt to analogize this to the [insurance] fraud provision of the Act . . . is likewise meritless." (*Id.* at 15.) Claimant cites Section 1110 of the Act, 77 P.S. § 1039.10,[16] which states that "[n]othing contained in this article shall be construed to limit the regulatory or investigative authority of any department or agency of the Commonwealth[,]" as support that "a WCJ may consider and rule upon allegations of fraudulent conduct arising in an active workers' compensation matter." (*Id.* (quoting 77 P.S. § 1039.10) (internal citations omitted).) Finally,

_____

[16] Section 1110 was added by Section 20 of the Act of July 2, 1993, P.L. 190.

21

Claimant argues that Employer's "assertions that [] due process[17] or Confrontation Clause[18] principles are implicated here are no less ridiculous than its position that a WCJ may not adjudicate matters involving criminal activity or conduct by an individual." (*Id.* at 16.)

In its Reply Brief, Employer asserts that Claimant provided no authority for the assertion that work-related injuries often stem from potentially criminal conduct. Further, Employer argues that this Court in *Cantarella* rejected that the claimant had been subjected to abnormal working conditions and also any "per se" rule that any specific conduct automatically qualifies as an abnormal working condition. (Employer's Reply Br. at 1-2.) Further, Employer argues that "Claimant and the WCJ want to be able to call someone a rapist and determine that a rape occurred[] but then claim it has no meaning or impact outside the workers' compensation

---

[17] Section 1 of the Fourteenth Amendment to the United States Constitution provides, in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV.

Section 9 of Article I of the Pennsylvania Constitution provides:

> In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.

Pa. CONST. art. I, § 9.

[18] The Sixth Amendment to the United States Constitution provides, in relevant part: "In all **criminal prosecutions**, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI (emphasis added).

22

arena[,]" which Employer characterizes as "truly absurd and . . . is in no way in line with how our system of laws operate[s]." (*Id.* at 3.)

## 2. Analysis

For the purpose of workers' compensation matters, the Act "appl[ies] to all injuries occurring within this Commonwealth[.]" Section 101 of the Act, 77 P.S. § 1. To provide compensation to injured workers, "a WCJ and the Board are authorized by the Act to determine whether or not an employee who alleges [the employee] was injured during the course of [their] employment is entitled to compensation." *Heath v. Workers' Comp. Appeal Bd. (Pa. Bd. of Prob. & Parole)*, 860 A.2d 25, 30 (Pa. 2004). In doing so, a WCJ is required to make credibility and evidentiary determinations, to make findings as to the facts underlying the matter, and to determine whether a claimant has met the burden of proving entitlement to compensation, and with regard to these findings and determinations, "the WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight." *Thompson v. Workers' Comp. Appeal Bd. (USF&G Co.)*, 781 A.2d 1146, 1150 (Pa. 2001).

It is well settled that work-related psychological injuries are compensable under Section 301(c)(1) of the Act, 77 P.S. § 411(1). *Archer*, 587 A.2d at 313. Our Supreme Court has explained that a claimant's burden of proof to recover benefits for a psychological injury is twofold, requiring the claimant first to "prove by objective evidence that [the claimant] has suffered a psych[ological] injury and[, second,] that such injury is other than a subjective reaction to normal working conditions." *Davis v. Workers' Comp. Appeal Bd. (Swarthmore Borough)*, 751 A.2d 168, 174 (Pa. 2000) (citing *Martin*, 568 A.2d at 159). "Even if a claimant shows actual, not merely perceived or imagined, employment events that have precipitated

23

[a] psych[ological] injury, the claimant must still prove the events to be abnormal in order to recover." *Id.* (citing *Wilson v. Workmen's Comp. Appeal Bd. (Aluminum Co. of Am.)*, 669 A.2d 338 (Pa. 1996)). Further, given the fact-intensive nature of psychological injury cases, "in determining whether actual working conditions are abnormal, they must be considered in the context of the specific employment." *U.S. Airways v. Workers' Comp. Appeal Bd. (Long)*, 756 A.2d 96, 101 (Pa. Cmwlth. 2000).

Here, Employer argues that the WCJ lacked authority to determine that Claimant had been raped or sexually assaulted by Coworker and that, in doing so, the WCJ violated Coworker's due process rights. We disagree. The Act extends to "all injuries occurring within this Commonwealth[,]" including those where the evidence implicates criminal conduct. 77 P.S. § 1.

Contrary to Employer's arguments, courts have found abnormal working conditions and granted benefits in other instances where the evidence implicated criminal conduct. For instance, in *RAG (Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton)*, 912 A.2d 1278 (Pa. 2007), the claimant alleged to have been the victim of sexual harassment by the claimant's supervisor. In holding that the harassment constituted abnormal working conditions where the supervisor harassed the claimant intensely and with high frequency, the Pennsylvania Supreme Court also noted that the supervisor's conduct "arguably constitute[d] criminal harassment." *Id.* at 1288. There was no indication that this limited the WCJ's authority or jurisdiction to decide whether the injury occurred and was compensable.

Similarly, in *Kochanowicz*, the claimant alleged to have been the victim of an armed robbery while working at the employer's retail store. The claimant averred

24

that the robbery caused him post-traumatic stress disorder. After considering that the claimant had received workplace training for such an incident, we nonetheless upheld the WCJ's finding that the robbery constituted abnormal working conditions given that the claimant had not experienced workplace violence in his 30-year employment. *Kochanowicz*, 108 A.3d at 934. Again, there was no impediment to the WCJ's authority or jurisdiction. Likewise, in *Philadelphia Electric Co. v. Workmen's Compensation Appeal Board (Miller)*, 643 A.2d 1186 (Pa. Cmwlth. 1994), the claimant, a meter reader, alleged to have been chased by a dog while working. The claimant further averred that the dog's owner then threatened to kill the claimant and proceeded to then chase the claimant with a gun. We determined that this conduct constituted an abnormal working condition that caused the claimant psychological injuries.

Finally, in *Donovan v. Workers' Compensation Appeal Board (Academy Medical Realty)*, 739 A.2d 1156 (Pa. Cmwlth. 1999), the claimant alleged an injury during employment as a janitor in a medical office resulting from exposure and wounding by hypodermic needles that were improperly disposed of. We held that this constituted an abnormal working condition, especially because improper disposal of infectious waste carried both civil and criminal penalties. *Id.* at 1163.

In these cases, the evidence implicated criminal conduct resulting in the claimants' injuries by actors who were not parties in the proceeding. Nonetheless, the WCJs and the Board were within their purview to determine that a compensable injury resulted from conduct that occurred in the course of the claimants' employment. These cases demonstrate that although the evidence may implicate criminal conduct, this does not limit the WCJ's or the Board's authority and jurisdiction to determine that a compensable, work-related injury occurred.

25

While Employer argues that "the Act does not give a WCJ jurisdiction over criminal matters to make findings of criminal wrongdoing and to [grant or] suspend benefits based thereon[,]" that is not what occurred. *See, e.g.*, *Brehm v. Workers' Comp. Appeal Bd. (Hygienic Sanitation Co.)*, 782 A.2d 1077, 1087 (Pa. Cmwlth. 2001) (Friedman, J., dissenting). As the Board astutely stated:

> We emphasize that our affirmance of the WCJ's finding of an abnormal working condition based on substantial, competent evidence does not relate to or overlap with the determination of whether a criminal act did or did not occur . . . . We acknowledge that the authority to prosecute the crimes of sexual assault and rape rests with the criminal justice system alone, which applies differing procedural rules and burdens of proof.

(Board's Op. at 13 n.3.) The WCJ's findings in this case did **not** constitute a legal determination that Coworker criminally raped or sexually assaulted Claimant. As Employer recognizes, there has been no criminal process in this matter, and Coworker "here does not face criminal prosecution or confinement[.]" (Employer's Br. at 35.) This was an administrative proceeding, and the WCJ did not apply the elements of the statutory provisions criminalizing rape and sexual assault or the very high standard of proof employed in criminal matters.

Here, the WCJ made credibility determinations, and found there was substantial evidence that Claimant was subjected to nonconsensual sexual intercourse at work, that this was an abnormal working condition, and that she sustained a resulting psychological injury which was not a subjective reaction to a normal working condition. This was within the WCJ's authority. That the WCJ also opined that such conduct amounted to rape does not render the WCJ's findings in error or diminish the WCJ's authority or jurisdiction. As the Board recognized, "a determination of whether a criminal act did or did not occur" was outside of the

Board's or the WCJ's jurisdiction. (Employer's Br. at 33 (citing Board Op. at 13 n.3).) The Board correctly emphasized that the WCJ's findings of fact in these matters do not amount to a determination as to any criminal liability stemming from the conduct at issue. (*See* Board's Op. at 13 n.3.)

Because Coworker is not a party, this is not a criminal proceeding, and there is no risk of an adverse adjudication as to Coworker, we also disagree that the WCJ's Decision implicates Coworker's due process rights or the Confrontation Clause. Employer cites no authority to support such a proposition. Indeed, that the Confrontation Clause concerns the rights of criminal defendants "[i]n . . . criminal prosecutions[]" belies that position. U.S. CONST. amend. VI.

Finally, we note that adopting Employer's position would be contrary to the purpose of the Act, which ensures that injured employees have a process available to seek workers' compensation benefits. Such a decision would render heinous conduct in the workplace that causes injury to go unchecked and would prevent employees injured on the job by such conduct from seeking compensation and redress of injury. This is especially true in light of the fact that the Act "replace[d] traditional common law rights and remedies[]" in regard to an employee's recovery for work-related injury against an employer. *East v. Workers' Comp. Appeal Bd. (USX Corp./Clairton)*, 828 A.2d 1016, 1021 (Pa. Cmwlth. 2003). Thus, we agree with Claimant that any potential criminal liability for conduct that is at issue in a workers' compensation matter does not negate a WCJ's jurisdiction and authority. Accordingly, the WCJ and the Board did not err on this basis.

27

*B.* *Whether the Board erred in holding that corroboration was not necessary to prove that an abnormal working condition occurred.*

1. Parties' Arguments

Employer argues that the WCJ and the Board erred in holding that "it is not necessary to determine if an actual rape or sexual assault occurred because all Claimant had to do was demonstrate abnormal working conditions and an 'actual event' that caused [Claimant's] alleged injuries." (Employer's Br. at 39.) Employer maintains that "corroboration was necessary[]" to show that the "sexual act . . . [was] unwanted" and that the Board erred in not so requiring. (*Id.* at 40.) Employer likens the WCJ's and the Board's determinations to "support the idea that a claimant can allege that aliens came down and injured her at work" and that "only [the] claimant's testimony that it happened would be required to sustain a compensable claim." (*Id.* at 41-42.)

In response, Claimant argues that corroborative evidence was not required in this matter. Claimant maintains that, in certain circumstances, corroborative evidence is not required to prove that an event constituting an abnormal working condition occurred. (Claimant's Br. at 20 (citing *Archer*, 587 A.2d at 901).) Claimant asserts that "[c]orroborative evidence is required to support the claimant's description of a general abnormal working environment that caused an injury; however, where a claimant testifies about actual events, corroborative evidence is not required." (*Id.* at 18 (citing *Donovan*, 739 A.2d at 1156).) Because Claimant established that Claimant sustained work-related injuries as a result of an actual, described event, Claimant maintains that the WCJ and the Board did not err.

2. Analysis

As explained above, the claimant in workers' compensation matters alleging a mental/mental injury carries the burden of proving that her injury was not a

28

subjective reaction to normal working conditions. Normally, "a claimant's testimony of abnormal working conditions must be corroborated." *Reigle v. Workmen's Comp. Appeal Bd. (Fed. Exp.)*, 601 A.2d 1331, 1334 (Pa. Cmwlth. 1992) (citing *Russella v. Workmen's Comp. Appeal Bd. (Nat'l Foam Sys. Inc.)*, 497 A.2d 290 (Pa. Cmwlth. 1985)). However, this Court created an exception to this general rule in *Archer*. There, the claimant alleged that harassment by the claimant's supervisor caused the claimant psychological injury. The Board denied benefits, concluding that the claimant was required to corroborate the allegation of mistreatment. We reversed, explaining that "[t]he testimony of the claimant in this case was not limited to her belief that she *felt* she was being harassed; she also described actual events[.]" *Archer*, 587 A.2d at 907 (emphasis in original). Accordingly, we held that "[w]hile objective evidence may well be necessary where an employee is describing subjective feelings, no such evidence is necessary where actual events are being described." *Id.* This Court explained that a contrary holding that "require[d] such evidence would allow an employer to mistreat its employees with impunity as long as such conduct was done in private." *Id.* at 906.

We addressed this exception again in *Philadelphia Electric Co*. There, the employer argued that our holding in *Archer* was limited to harassment and mistreatment by an employer on its premises and was not extended to other circumstances. We disagreed, explaining that "*Archer* and its progeny contain no admonition that these cases be limited in this manner." *Phila. Elec. Co.*, 643 A.2d at 1189. Because the claimant there testified to actual, specific events with respect to being attacked by a dog and threatened with a gun by the dog's owner, testimony that the WCJ found credible, we held that corroboration was not required. *Id.*; *see, e.g.*, *Donovan*, 739 A.2d at 1163 (holding that the claimant's testimony of being

29

injured by improperly disposed hypodermic needles did not require corroboration because the claimant was describing actual events); *Monessen, Inc. v. Workmen's Comp. Appeal Board (Marsh)*, 631 A.2d 1119 (Pa. Cmwlth. 1993) (claimant who described being nearly run over by an oiling wheel of a coke oven door did not need to present corroborative evidence of this event where the WCJ finds that such event occurred).

In the present case, Employer maintains that Claimant was required to present corroborating evidence that the sexual intercourse was nonconsensual. We disagree. Here, Claimant testified that the sexual intercourse was nonconsensual, that Claimant told Coworker no, and that Coworker forced Claimant to engage in the intercourse using the force of Coworker's body weight. (FOF ¶ 4(c), (n).) The WCJ found Claimant's testimony to be credible and persuasive in light of "[C]laimant's composure and demeanor during [Claimant's] live testimony[.]" (*Id.* ¶ 14.) Similar to the claimant in *Philadelphia Electric Co.* who did not need to corroborate the allegations of harassment and mistreatment because the testimony related to an event and the WCJ found the testimony credible, 643 A.2d at 1189, Claimant here testified to actual, perceived events, not just Claimant's subjective reaction to normal working conditions. Moreover, the WCJ found Claimant's testimony to be persuasive and credible. (FOF ¶ 14.)

Therefore, as determined in *Archer*, because Claimant was not testifying to how an event made Claimant subjectively feel but describing an actual event, Claimant was not required to present corroborating evidence. 587 A.2d at 906-07. Just as such a holding in *Archer* would permit "an employer to mistreat its employees with impunity as long as such conduct was done in private[,]" such a decision here would allow an employee to be forced into nonconsensual sexual intercourse in

30

private without redress for the psychological injuries. *Id.* at 906. Accordingly, because the facts presented in this case fit squarely in the exception under *Archer*, the Board did not err in concluding that corroboration was not required and affirming the WCJ's Decision.

### C. Whether the WCJ's findings were arbitrary and capricious and not supported by substantial, competent evidence of record.

#### 1. Parties' Arguments

Employer argues that the WCJ's findings were arbitrary and capricious and not based on competent evidence. Employer asserts that the Board "did not mention the conflicting evidence . . . in this case or the fact that the WCJ did not address the conflicting evidence but merely ignored [the] same." (Employer's Br. at 40.) First, Employer submits that the WCJ erred in finding Dr. Wiley to be more credible than Dr. Bora, alleging that Dr. Wiley's testimony was contradictory to Claimant's testimony and further "demonstrate[d] that Dr. Wiley was a paid puppet being directed in his treatment of Claimant by [Claimant's attorney.]" (*Id.* at 43.) Second, Employer posits that the WCJ ignored contradictory evidence as to Claimant's alleged injuries and Dr. Bora's testimony and opinions. (*Id.* at 44-45.) Third, Employer asserts that the WCJ misstated Dr. Bora's testimony with respect to his reliance on Coworker's and Claimant's prior relationship. (*Id.* at 45 n.7.)

Finally, Employer asserts that the WCJ erred in ignoring substantial evidence that the sexual intercourse was consensual. In addition to Claimant's statements to the State Police that Claimant was not raped or sexually assaulted, Employer argues that "[t]he WCJ failed to accord proper weight to the prior sexual relationship between Claimant and [Coworker], as well as the sexual nature of [C]laimant's text[ message]s to [Coworker] before and on May 20, 2018." (*Id.* at 41.) Moreover,

31

Employer asserts that substantial evidence shows "[C]laimant only became upset about this alleged interaction/incident and alleged that a rape/sexual assault took place once she found out that [Coworker] was married and that she could not pursue a relationship with [Coworker]." (*Id.* at 46-47.) Employer maintains that the WCJ's finding that Claimant was upset immediately after the incident was in error because: Claimant continued to work after the incident "without any issues"; Claimant did not speak with anyone about the incident on May 20, 2018; Claimant used the term "lol" when Claimant texted Coworker the following day after the incident; and the other text messages from Claimant to Coworker that "tend to show a woman seeking out the attention of a man who she had a flirtatious relationship with and who she later discovers is married." (*Id.* at 47.) Moreover, Employer asserts that the WCJ ignored Claimant's "signed statement" given to the State Police that the incident was not rape or sexual assault and that Claimant was more upset about learning that Coworker was married. (*Id.* at 48-49.) Employer maintains that Claimant only alleged that a rape or sexual assault occurred after Officer opined that Claimant had been raped and, moreover, that the evidence of record does not support that Claimant was sexually assaulted or raped. (*Id.* at 50.)

Claimant responds that the Board properly affirmed the WCJ's findings because Claimant proved with objective evidence that Claimant's psychological injury resulted from abnormal working conditions. Claimant argues that she proved that the abnormal working condition in this case was the "non-consensual sexual intercourse forced upon her by [Coworker]," and that Employer's arguments "are little more than meritless attacks on the WCJ's credibility determinations, which are well-reasoned and supported by substantial evidence of record." (Claimant's Br. at 21.) Claimant maintains that the WCJ thoroughly explained the WCJ's credibility

32

determinations and that Employer's position "attempts to manipulate the evidence and overcome a nuanced and clearly well-reasoned and supported decision by the WCJ[.]" (*Id.* at 25.)

In its Reply Brief, Employer maintains that the evidence in this matter "reflects" that: (1) "Claimant clearly lied ([e]ither to [Trooper] or under oath in this proceeding)"; (2) "Claimant wanted a relationship with [Coworker]"; (3) "Claimant only became upset when she realized [Coworker] was married"; (4) "Claimant never sought treatment until she obtained an attorney"; and (5) "Claimant's expert was tainted." (Employer's Reply Br. at 4.)

   2.   Analysis

In workers' compensation cases, it is well settled "that the WCJ has the exclusive authority to make findings of fact and credibility determinations." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1052 (Pa. 2003). Thus, as stated above, in these matters, "[t]he WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight." *Thompson*, 781 A.2d at 1150. Our Supreme Court has explained that "[t]he deference generally accorded to fact-finders in disputed proceedings is a function of the comparative advantage the fact-finder has over any reviewing body in making assessments that may depend, *inter alia*, upon the demeanor of witnesses." *Daniels*, 828 A.2d at 1052. Accordingly, the WCJ may reject or accept the testimony of any witness. *A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013).

In reviewing the WCJ's credibility and evidentiary determinations, "[i]t is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the

33

findings actually made." *Furnari v. Workers' Comp. Appeal Bd. (Temple Inland)*, 90 A.3d 53, 60 (Pa. Cmwlth. 2014) (citation omitted).  Thus, this Court's authority in these matters is limited to reviewing the entire record to see if it contains evidence that a reasonable person might find sufficient to support the WCJ's findings.  *Id.*  If the record contains such evidence, the findings must be upheld, even though the record may contain conflicting evidence.  *Id.*

A capricious disregard only occurs when the WCJ deliberately ignores relevant, competent evidence.  *Capasso v. Workers' Comp. Appeal Bd. (RACS Assocs., Inc.)*, 851 A.2d 997, 999 (Pa. Cmwlth. 2004).  Capricious disregard of evidence "is a deliberate and baseless disregard of apparently trustworthy evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 144 (Pa. Cmwlth. 2004).  Nonetheless, "where there is substantial evidence to support [a WCJ's] factual findings, and those findings in turn support the conclusions, it should remain a rare instance in which an appellate court would disturb an adjudication based upon capricious disregard." *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487 n.14 (Pa. 2002).

Finally, a WCJ's decision must satisfy the reasoned decision requirements of Section 422(a) of the Act, 77 P.S. § 834.  Section 422(a) provides, in relevant part, that

> [a]ll parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached.

77 P.S. § 834.  To satisfy the reasoned decision requirements, a WCJ must set forth the rationale for the decision by specifying the evidence relied upon and reasons for

34

accepting it. *Daniels*, 828 A.2d at 1047; *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 194 (Pa. Cmwlth. 2006). In the face of conflicting evidence, the WCJ "must adequately explain the reasons for rejecting or discrediting competent evidence." 77 P.S. § 834. "Section 422(a) does not require the WCJ to discuss all of the evidence presented[]" but only "to make the findings necessary to resolve the issues raised by the evidence and relevant to the decision." *Dorsey*, 893 A.2d at 194 n.4. "[T]he purpose of a reasoned decision is to spare the reviewing court from having to imagine why the WCJ believed one witness over another[]" and to "permit adequate appellate review." *Id.* at 194, 196.

In determining credibility, a WCJ may satisfy the reasoned decision requirements by basing a credibility determination on a witness's demeanor during live testimony. *Daniels*, 828 A.2d at 1052-53. However, "[w]here medical experts testify by deposition, a WCJ's resolution of conflicting evidence must be supported by more than a statement that one expert is deemed more credible than another." *Dorsey*, 893 A.2d at 194. The WCJ must articulate an objective basis for credibility determinations in order to allow for effective appellate review. *Id.* Nevertheless, "Section 422(a) does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations." *Dorsey*, 893 A.2d at 194.

Looking to the present case, Employer first argues that the WCJ erred in crediting Dr. Wiley's testimony over that of Dr. Bora. In order to comply with the reasoned decision requirements for the purposes of credibility determinations of expert witnesses, the WCJ was required to provide "more than just a statement that one expert is deemed more credible than another[]" and to articulate an objective credibility determination to allow for effective appellate review. *Id.* Here the WCJ's credibility determination complied with the reasoned decision requirement because

35

it contained more than just a conclusory statement regarding the expert's credibility. The WCJ explained that Dr. Wiley's testimony was more credible and persuasive than that of Dr. Bora because it was consistent with Claimant's credible testimony and because Dr. Wiley was Claimant's treating psychologist and was, therefore, more familiar with Claimant's experiences and symptoms. (FOF ¶ 15.) The WCJ then explained her rejection of Dr. Bora's testimony, stating that Dr. Bora "misstate[d] the time[]line of Claimant's distress" over the incident, determined that Claimant had a history of mental illness solely from one note in her family doctor's records despite there being no other indication of previous mental illnesses, and "admit[ted] that if Claimant were a private patient, [Dr. Bora] would not question whether or not she had been sexually assaulted but would focus on treatment assuming the history to be true." (*Id.* ¶ 16.) Thus, we disagree that the WCJ erred in this credibility determination, as the WCJ articulated an objective basis for the determination. *Dorsey*, 893 A.2d at 194. Because "Section 422(a) does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations[,]" *id.*, and given that "[t]he WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight[,]" *Thompson*, 781 A.2d at 1150, we may not supplant the WCJ's credibility determinations with our own.

Employer next submits that the WCJ ignored contradictory evidence regarding inconsistencies between Dr. Wiley's and Claimant's testimony and "the credible testimony of Dr. Bora." (Employer's Br. at 45.) Our review of the evidence submitted in this case and the WCJ's findings show that the WCJ complied with this directive. The WCJ's findings permitted ample appellate review and do not force this Court to "imagine why the WCJ believed one witness over another[.]" *Id.* As explained above, the WCJ articulated objective reasons for finding Dr. Wiley's

36

testimony credible and finding Dr. Bora to be **not** credible. Moreover, a WCJ need not "discuss all of the evidence presented[]" but only "to make the findings necessary to resolve the issues raised by the evidence and relevant to the decision." *Dorsey* 893 A.2d at 194 n.4. Because it cannot be said that a reasonable person would not find the evidence of record to support the WCJ's findings, *Furnari*, 90 A.3d at 60, and because substantial evidence exists to support those findings, *Leon E. Wintermyer, Inc.*, 812 A.2d at 487 n.14, it is not within this Court's authority to disturb them.

Third, Employer argues that the WCJ mischaracterized Dr. Bora's testimony with regard to Dr. Bora's reliance on Coworker and Claimant's prior relationship. The WCJ found that Dr. Bora's position was that "because . . . Claimant flirted with" and "had a prior sexual relationship with" Coworker, Claimant was not raped. (FOF ¶ 16.) Our review of Dr. Bora's testimony is consistent with this finding. After being asked whether Dr. Bora "believed that some sort of rape or sexual assault occurred on May 20[], 2018[,]" Dr. Bora testified: "Based on the records that I reviewed, it's not clear to me that a rape occurred. [C]laimant was texting [Coworker] immediately prior to the incident and after the incident, they had a history of sexual relations previously[, and i]t appeared they were having an ongoing flirtation[.]" (R.R. at 653a.) Given the consistency between this testimony and the WCJ's finding, we disagree that the WCJ mischaracterized Dr. Bora's reliance on Coworker and Claimant's prior relationship.

Employer last argues that the WCJ's findings were arbitrary and capricious because the WCJ ignored evidence showing that the sexual intercourse was consensual. We disagree. A review of the WCJ's findings show that the WCJ complied with the reasoned decision requirements by "adequately explain[ing] the

reasons for rejecting or discrediting competent evidence." 77 P.S. § 834. With regard to the text messages that Claimant sent to Coworker after the May 20, 2018 incident that used the term "lol," the WCJ found that it was "not possible to accurately ascribe sentiment or emotion to texts[,]" but that Claimant sent the texts to "confront[ Coworker] by [] telling [Coworker] that she was upset over" the incident, that Claimant's "appetite was affected[,]" "that she could not ignore what had happened[,]" and that Claimant "felt used and violated." (FOF ¶ 12.) The WCJ also found that "[t]hese texts were sent before Claimant was told that [Coworker] was married." (*Id.*) Next, with respect to the "signed statement" that Claimant gave to the State Police, the WCJ reviewed the videotape of Claimant's interview with Trooper and Trooper's testimony and determined that Trooper's conclusions that Claimant consented to the sexual intercourse and his interview and investigation approach were not reliable. (*Id.* ¶¶ 13, 18.) The WCJ explained that Trooper's decision to write questions that "presuppose an answer compelling a conclusion that the sex was consensual" amounted to a leading approach and that the resulting document did not constitute Claimant's "statement." (*Id.* ¶ 18.) The WCJ also disagreed with Trooper's opinion that Claimant was only upset because she found out that Coworker was married. (*Id.*) Accordingly, the WCJ rejected Trooper's conclusions as to consent as unreliable and also did not credit Claimant's "statement" due to the leading nature of the questions that Trooper wrote for Claimant. *Id.* These findings show that the WCJ did not "deliberate[ly] and baseless[ly] disregard . . . apparently trustworthy evidence." *Williams*, 862 A.2d at 144. Rather, the WCJ adequately explained the reasons for rejecting this evidence. While Employer asks this Court to instead determine that this evidence shows that the sexual intercourse was consensual, such an evidentiary determination is within

38

the discretion of the WCJ in these matters. *Thompson*, 781 A.2d at 1150. Because the WCJ's findings were supported by substantial evidence and complied with the reasoned decision requirements, the WCJ's findings were not arbitrary or capricious.

> D.    Whether the WCJ's crediting of Officer's testimony as reliable and consistent with Claimant's testimony constituted reversible error.

### 1.    Parties' Arguments

Employer last argues that the WCJ erred in finding Officer's testimony to be credible because Officer did not testify in this matter. Because the WCJ found Officer's testimony to be credible and accepted it as fact, Employer maintains that the WCJ's credibility determination as to Claimant constituted reversible error, as the WCJ relied in part on the consistency between Officer's and Claimant's testimony.

Claimant acknowledges that the WCJ's finding that Officer's testimony was credible was in error but asserts that this error was harmless because any statements alleged to have been made by Officer were merely cumulative of Claimant's testimony and established through other evidence of record. (Claimant's Br. at 23.)

### 2.    Analysis

This Court has held that a WCJ's error is harmless where "other competent evidence, standing alone, exists in the record to support the [WCJ's] findings." *Nabisco, Inc. v. Workmen's Comp. Appeal Bd. (Cummings)*, 651 A.2d 716, 718-19 (Pa. Cmwlth. 1994). In *Nabisco*, the WCJ erred by admitting hearsay evidence that supported the finding that the claimant was injured while in the course of employment. We held that the error was harmless because the WCJ also relied on the testimony of other witnesses to support the WCJ's findings. *Id.* at 719.

Here, the WCJ's crediting of Officer's testimony was harmless error. While Officer did not offer any testimony, the WCJ found that "[t]he testimony of Officer [] has been reviewed and is found credible and persuasive.[19] [Officer's] testimony is consistent with Claimant's credible testimony and is accepted as fact." (FOF ¶ 17.) Further, the WCJ found that "Claimant's testimony is also support[ed] by the testimony of Officer []." (*Id.* ¶ 14.) However, the WCJ did not state what evidentiary findings were made based on Officer's testimony. With regard to using Officer's testimony to support Claimant's testimony, the WCJ also relied on Claimant's demeanor during live testimony, Claimant's deposition testimony, and the videotape interview with Trooper. Such evidence is more than sufficient for a WCJ's credibility determination, given that "a WCJ may satisfy the reasoned decision requirements by basing a credibility determination on a witness's demeanor during live testimony." *Daniels*, 828 A.2d at 1052-53. Moreover, there is nothing to suggest that the WCJ would not have made the same credibility determination as to Claimant without Officer's "testimony." Further, Claimant's testimony regarding the conversation with Officer is also supported by the testimony of Employer's own witness, EEO Director. (*Id.* ¶ 11(d).) Accordingly, because "other competent evidence, standing alone, exists to support the [WCJ's] findings," *Nabisco Inc.*, 651 A.2d at 718-19, any error of the WCJ in this matter was harmless.

III.   CONCLUSION

In sum: (1) the WCJ had the authority and jurisdiction to determine that abnormal working conditions caused Claimant's psychological injuries, regardless of whether the evidence implicates criminal conduct; (2) because Claimant credibly

---

[19] After review, it appears that the WCJ misunderstood EEO Director's notes of the interview with Officer to be Officer's testimony in this matter.

testified to actual events, corroboration was not necessary to prove that the abnormal working conditions existed; (3) the WCJ's findings were not arbitrary and capricious and were supported by substantial evidence of record; and (4) the WCJ's crediting of Officer's testimony constituted harmless error. Accordingly, we affirm the Board's Order.

_____
**RENÉE COHN JUBELIRER,** Judge

Judge Fizzano Cannon did not participate in the decision in this case.

41

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania,    :
Department of Corrections - SCI    :
Chester,    :
              Petitioner    :
   :
          v.    :   No. 150 C.D. 2021
   :
Workers' Compensation Appeal    :
Board,    :
          Respondent    :

## O R D E R

    **NOW**, November 10, 2021, the Order of Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED**.

 

_____

**RENÉE COHN JUBELIRER,** Judge